In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-15-00230-CV
_____

LYNDA FARRELL, AS AN HEIR OF SARAH FARRELL, Appellant

V.

REGENT CARE CENTER OF THE WOODLANDS, LIMITED
PARTNERSHIP D/B/A REGENT CARE CENTER OF THE WOODLANDS;
AND REGENT CARE CENTER OF THE WOODLANDS, Appellees

On Appeal from the 284th District Court
Montgomery County, Texas
Trial Cause No. 13-03-02541-CV

## MEMORANDUM OPINION

Appellant Lynda Farrell, as an heir of Sarah Farrell, appeals the trial court's judgment in favor of appellees Regent Care Center of The Woodlands, Limited Partnership d/b/a Regent Care Center of The Woodlands, and Regent Care Center of The Woodlands (collectively herein "Regent Care") following a jury trial in her health care liability suit against Regent Care. In one issue, Farrell argues that the trial court abused its discretion by refusing to admit certain billing records

1

pertaining to Sarah Farrell's stay at Regent Care into evidence at trial. We affirm the judgment of the trial court.

## I.    Background

In 2007, Sarah Farrell and her daughter, Lynda Farrell, moved from California to The Woodlands, Texas. Sarah, who was ninety-six years old at the time and legally blind, lived with Lynda. In 2009, Sarah was hospitalized to treat a pulmonary embolism. Following her hospitalization, she was released to Regent Care, a nursing home, for continued care. Sarah stayed at Regent Care for approximately five or six weeks and then returned home to Lynda's care.

In July of 2011, Sarah turned one hundred years old. Several months later, on January 28, 2012, Sarah collapsed while at Lynda's house and was taken by ambulance to St. Luke's Hospital, where she was treated for a urinary tract infection and hypotension. Sarah remained in the hospital for three days while she received intravenous fluids and antibiotics to treat her urinary tract infection. On February 1, 2012, Sarah was discharged to Regent Care under the care of Dr. Michael Chang and placed on palliative care. On admission to Regent Care, Sarah's skin was noted to be intact, but at risk for developing pressure ulcers. Sarah was also noted to have a small area of discolored skin on her sacrum from an old wound.

Upon her admission to Regent Care, Sarah was placed in the facility's sub-acute unit for continued treatment of her urinary tract infection. The evidence showed that Regent Care assigned at least two charge nurses to each hall within its sub-acute unit. The charge nurses made rounds on the patients on their assigned halls at least every hour, and their responsibilities included assessing patients, following physician's orders regarding treatment, checking patients' bodily systems, turning and repositioning patients, feeding patients, and ensuring that patients were clean, dry, and comfortable. In addition to the charge nurses, Regent Care also employed treatment nurses (also referred to as wound care nurses), who were primarily responsible for performing wound care on patients. Regent Care's former director of nursing explained that at Regent Care, if a charge nurse assesses a patient and observes that the patient has developed a wound, such as a pressure ulcer, it is the charge nurse's responsibility to call the physician, provide an assessment of her findings, and obtain an order from the physician for treatment of the wound. If the physician provides an order for wound care treatment, the treatment nurse then becomes primarily responsible for providing wound care treatment to the patient in accordance with the physician's order, although the charge nurse would remain responsible for overseeing the patient as a whole. The

treatment nurse would also be responsible for reporting any changes in the condition of the wound to the physician.

With the exception of one brief hospitalization in late February 2012, Sarah remained at Regent Care from February 1, 2012 to April 25, 2012. On April 25, Sarah was re-admitted to St. Luke's Hospital to treat a recurrent urinary tract infection that was not responding to oral antibiotics. Because Sarah had dementia and a history of pulling out IV lines, a port-a-cath was placed at the hospital to provide long-term IV access. Following the placement of the port-a-cath, Sarah was re-admitted to Regent Care on April 28, 2012.

Upon Sarah's readmission to Regent Care on April 28, a charge nurse at Regent Care assessed Sarah and noted that she had developed two "open areas" on her sacrum. Based on Regent Care's records, these open areas were not present when Sarah was transferred from Regent Care to St. Luke's Hospital on April 25. Regent Care's records show that on April 28, Dr. Chang entered a physician's order requiring that the two open areas be cleaned with normal saline and that a dressing be applied daily until the treatment nurse could assess the wounds.

The next morning, on April 29, the treatment nurse at Regent Care assessed the open areas on Sarah's sacrum and determined that Sarah had a stage-two

pressure ulcer on her sacrum that measured 1 cm by 0.5 cm in size. [1] On April 29, the treatment nurse contacted Dr. Chang, who discontinued his previous order from April 28, and entered a new physician's order as of April 29. The new order required the affected area of the sacrum to be cleaned with normal saline, patted dry, and for a duoderm bandage to be applied every other day. Regent Care's records indicate that a treatment nurse provided the treatment required by this order on April 29.

However, Regent Care's records show that by May 11, 2012, the pressure ulcer on Sarah's sacrum had developed from a stage-two pressure ulcer into an "unstageable" ulcer that measured 4.8 cm by 2.7 cm in size. [2] The pressure ulcer was also noted to have superficial eschar, or necrotic tissue, present on the wound bed. On May 11, 2012, two new physician's orders were entered pertaining to Sarah's pressure ulcer. The first order required that Sarah's coccyx (tailbone) be cleaned with normal saline, that Santyl be applied to the wound base, and that the wound to be covered with a duoderm dressing every other day. A second order required the duoderm dressing to be checked every day. Regent Care's records

---

[1] A "stage-two" pressure ulcer is an ulcer that is missing the first layer of epidermis skin or that partially goes through the dermis layer of the skin.

[2] An ulcer is "unstageable" if it has gone through the full thickness of the skin, but the actual depth of the ulcer cannot be determined because of slough or necrotic tissue covering the wound bed.

indicate that, beginning on May 11, Regent Care's treatment nurses provided treatment to Sarah's pressure ulcer in accordance with these two new orders.

On May 16, 2012, Sarah was evaluated by Dr. Penni Russo-Going, a wound care physician. On that date, Dr. Russo-Going noted that Sarah had an unstageable pressure ulcer on her sacrum that measured 6 cm by 2 cm in size. Dr. Russo-Going treated the wound and recommended additional treatment for it. Following her initial evaluation of Sarah on May 16, Dr. Russo-Going made rounds on Sarah once a week to evaluate the progress of her wound. On June 6, 2012, during her weekly evaluation, Dr. Russo-Going noted that Sarah's condition had worsened significantly. She explained that Sarah looked "cachectic" and "unwell[.]"Based on the depth and condition of the wound, Dr. Russo-Going determined that the wound was now a stage-four pressure ulcer. She again treated the wound and recommended additional orders for treatment of the wound.

On June 11, 2012, Sarah was admitted to St. Luke's Hospital with complaints of vomiting. At the hospital, Sarah was diagnosed with a urinary tract infection and a stage-four sacral decubitus ulcer. She was also noted to be anemic. Sarah was treated with antibiotics and was given a blood transfusion. A wound vac was also placed to treat Sarah's pressure ulcer. Sarah was re-admitted to Regent Care on June 15, 2012. Three days later, on June 18, 2012, Sarah passed away.

6

Sarah's medical records list her "Final Diagnosis" as "UTI, Syncope, Hypertension, TIA, Wound[,] CAD, Dementia, Malaise and Fatigue, Insomnia, Arthropathy[,]" and "Adult Failure to Thrive[.]"

In March of 2013, Lynda filed suit against Regent Care, alleging that Regent Care and its staff were negligent in their treatment of Sarah's pressure ulcer. Among other things, Lynda alleged that Regent Care "fail[ed] to take the proper steps to appropriately and timely treat [Sarah's] sacral ulcer and to prevent her ulcer from worsening." She alleged that as a result of Regent Care's negligence, "[Sarah's] small, superficial Stage II ulcer progressed into an infected Stage IV pressure ulcer" that required extensive surgical treatment and wound vac placement.[3] Regent Care filed an answer, generally denying Lynda's allegations and asserting numerous defenses to Lynda's claims.

On March 2, 2015, the case proceeded to trial before a jury. At trial, Lynda argued, among other things, that Regent Care's nursing staff was negligent by failing to provide wound care to Sarah between April 30, 2012 and May 11, 2012. Regent Care disputed this contention, asserting that its nursing staff followed the physician's orders that were in place for Sarah's pressure ulcer and provided proper wound care treatment to Sarah during this twelve-day period.

___

[3]Lynda did not allege that Regent Care's alleged negligence caused or contributed to Sarah's death.

As it pertains to this issue, the evidence at trial established that the treatment nurses at Regent Care maintained a "treatment book[,]" in which they kept records detailing the wound care treatment that they provided to patients at Regent Care. These records were kept separately from the records maintained in the patients' medical charts. The records that were included in the treatment book generally consisted of the following forms: (1) a "wound[/]skin" record (2) a treatment administration record ("TAR"), and (3) a comprehensive care plan for the wound. Sarah's medical records from Regent Care were admitted into evidence at trial. It is undisputed that Sarah's medical records do not contain a wound/skin record, a TAR, or a care plan for the pressure ulcer on Sarah's sacrum for any date prior to May 11, 2012. Instead, the first wound/skin record, TAR, and care plan that appear in Sarah's medical records are dated May 11, 2012, and describe the pressure ulcer on Sarah's sacrum as a "new" wound with a "date of onset" of May 11, 2012.

At trial, Dr. Aimee Garcia, Lynda's expert witness, testified that Regent Care's nursing staff breached the applicable standard of care because it did not provide appropriate care to treat Sarah's pressure ulcer. Specifically, she testified that Regent Care's records showed that Sarah's physician entered an order on April 29, 2012, requiring the duoderm dressing on Sarah's pressure ulcer to be changed every other day. She testified that, in her opinion, this order was not followed

8

between the dates of April 30, 2012 and May 11, 2012, because Regent Care's medical records contain no documentation showing that the dressing on the wound was changed during that time period.

In response to this argument, Regent Care presented testimony from Tanisha Suber, who testified that she worked as a treatment nurse at Regent Care between April and June of 2012 and provided care to Sarah during that time period. Nurse Suber testified that when Sarah was re-admitted to Regent Care on April 28, 2012, Sarah had two separate wounds on her sacrum that were very close together. On May 11, 2012, the two wounds merged together to form one larger wound. Nurse Suber explained that when two wounds merge and become one, she considers the resulting wound to be a "new" wound. When she discovered that the two wounds had merged, Nurse Suber notified Sarah's physician, Dr. Chang, and Lynda. In addition, Nurse Suber explained that she removed all of the records in her treatment book from before May 11 that pertained to the "old" wounds and sent them to Regent Care's medical records department. She testified that she did not know what happened to those records after she sent them to the medical records department. She testified that she then began new treatment records for the "new" merged wound on May 11, 2012.

Regent Care also presented the daily nursing records maintained by its charge nurses to show that the dressing on Sarah's pressure ulcer was changed in accordance with the physician's order entered on April 28, 2012. The record reflects that the charge nurses were responsible for filling out various nursing records, including a record entitled "DAILY CUSTODIAL/SKILLED NURSING NOTES" (hereinafter, "skilled nursing notes"). Each skilled nursing note consists of two pages. The first page contains a chart with several sections, including a section entitled "SKIN[.]"Under the "SKIN" section, there is a line containing the word "Dressing[,]" next to which there are three boxes that can be checked for the day shift, the evening shift, and the night shift. Under the line for "Dressing," there is a line containing the words "Wound Care[,]" next to which there are, again, three boxes that can be checked for each shift. Under the line for "Wound Care[,]" there is a line containing the word "Site" with a single blank space next to it. On the second page of the document, there is a place to record handwritten comments as well as the date and time of those comments.

The entries in the skilled nursing notes for Sarah for the dates between April 28, 2012 and May 11, 2012 can be summarized as follows:

| Date | Description |
|------|-------------|
| 4/28/12 | • "Dressing" is checked for the evening shift.<br>• "Wound Care" is checked for one shift (although it is unclear whether it is the day or evening shift).<br>• "Site: Open area to sacrum[.]"<br>• The comments for 7:00 p.m. state: "Resident [r]e-admitted to RCCW . . . . On assessment Resident noted [with] 2 open areas covered by duoderm. [Treatment] nurse to assess and [treat]." |
| 4/29/12 | • "Dressing" is not checked for any shift.<br>• "Wound Care" is checked for the day, evening, and night shifts.<br>• "Site: Buttocks[.]"<br>• The comments for 10:00 a.m. state: "Wound care assessment. Stage 2 to sacral coccyx. 1.0 cm. x. 0.5 cm.[,] granulation tissue. Cleaned [with normal saline], pat dry and apply duoderm every other day." The comments for 1:00 p.m. state: "[Treatment] to buttocks per [treatment] nurse." |
| 4/30/12 | • "Dressing" is not checked for any shift.<br>• "Wound Care" is checked for the day, evening, and night shifts.<br>• "Site: Buttocks[.]"<br>• The comments for 2:00 a.m. state: "[Treatment] to [b]uttocks done as ordered for st. II coccyx." |
| 5/01/12 through 5/02/12 | • "Dressing" is not checked for any shift.<br>• "Wound Care" is checked for the day, evening, and night shifts.<br>• "Site: Buttocks[.]"<br>• The comments for 2:00 a.m. state: [Treatment] to buttocks done as ordered." |
| 5/03/12 through 5/05/12 | • "Dressing" is not checked for any shift.<br>• "Wound Care" is checked for the day, evening, and night shifts.<br>• "Site: Buttocks[.]" |
| 5/06/12 | • "Dressing" is not checked for any shift.<br>• "Wound Care" is checked for the evening and night shifts. |

| | |
|---|---|
| | • "Site" states: "Buttocks[.]" |
| 5/07/12 through 5/09/12 | • "Dressing" is not checked for any shift. <br> • "Wound Care" is checked for the day, evening, and night shifts. <br> • "Site" states: "Buttocks[.]" |
| 5/10/12 | • "Dressing" is not checked for any shift. <br> • "Wound Care" is checked for the evening and night shifts. |
| 5/11/12 | • "Dressing" is not checked for any shift. <br> • "Wound Care" is checked for the day, evening, and night shifts. <br> • "Site" states: "Buttocks[.]" <br> • The comments for 3:30 p.m. state: "Wound care treatment on coccyx area[,] unstageable [with] superficial eschar and granulation. 4.8 x 2.7 cm size[,] [no] drainage[,] [no] odor. Cleaned [with normal saline] and applied Santyl and ____ [illegible]. Notified daughter of wound[,] verbalized understanding. Wound care doctor to assess." |

Anne Burke, a licensed vocational nurse who worked as a charge nurse at Regent Care between April and June of 2012, testified that she filled out portions of several of the skilled nursing notes pertaining to Sarah between April 28, 2012 and May 11, 2012. She explained that when she put a check mark next to "Wound Care" for a specific shift, it meant that during that shift she had monitored the wound on Sarah's buttocks and that she had made sure the dressing was in place and that it was clean and dry. She testified that her check mark also meant that she had made sure that the dressing on Sarah's buttocks was being changed every other day, as ordered by Sarah's physician. In this respect, Nurse Burke explained that

12

she personally was not the one who was changing the dressings on Sarah's sacral wound during the time period between April 28, 2012 and May 11, 2012. Instead, the treatment nurse "[m]ost likely" was the one who was performing that task. Nevertheless, Nurse Burke explained that she was able to determine when the dressing was changed because the nurse who changed the dressing would date and initial the new dressing with a permanent marker every time she changed it.

Dr. Garcia, on the other hand, testified that none of the skilled nursing notes for the dates between April 30, 2012 and May 11, 2012, reflect a check mark in the boxes next to "Dressing[.]"Based on this fact, Dr. Garcia testified that it did not appear that Regent Care's nursing staff was in fact changing the dressing on Sarah's pressure wound during this time period.

Regent Care also presented testimony from Dr. Russo-Going to show that it was unlikely that Regent Care's nursing staff failed to provide treatment to Sarah's pressure ulcer between April 30, 2012 and May 11, 2012. Specifically, Dr. Russo-Going testified that when she initially observed the wound on May 16, the wound did not appear as though it had been untreated for eleven days. She explained that if the wound had not been treated for that period of time, there were two potential scenarios. First, if a dressing had been placed on the wound and remained there for an extended period of time, the wound would have had a significant amount of

drainage and much more necrotic tissue than it had when she saw it on May 16. Second, if no dressing had been placed on the wound and the wound was then left untreated for an extended period of time, the wound would have appeared dried out, and it did not appear that way on May 16. Dr. Garcia, by contrast, testified that the fact that Sarah's pressure ulcer was noted to have superficial eschar on May 11, indicates that treatment had not been provided in the preceding five to seven days because eschar takes at least that amount of time to form.

In further support of her claim that Regent Care failed to provide wound care treatment to Sarah between April 30, 2012 and May 11, 2012, Lynda attempted on two occasions to introduce certain billing records pertaining to Sarah's stay at Regent Care into evidence at trial. Lynda's trial counsel argued that the billing records reflected that no charges were made for wound care supplies between the dates of April 30, 2012 and May 11, 2012, and that the billing records were therefore consistent with Sarah's medical records, which purportedly showed that no wound care treatment was provided to Sarah during that time period. The trial court sustained Regent Care's objections to the billing records on the ground that Lynda failed to lay the proper predicate for their admission and refused to admit the records into evidence at trial.

14

Following the parties' closing arguments, the jury returned a verdict in favor of Regent Care. On March 11, 2015, the trial court entered a take nothing final judgment against Lynda. Lynda filed a motion for new trial on April 7, 2015, asserting that the trial court abused its discretion by excluding the billing records pertaining to Sarah's stay at Regent Care. On May 26, 2015, Lynda's motion for new trial was overruled by operation of law. *See* Tex. R. Civ. P. 4, 329b(c). Nevertheless, the records reflects that the trial court signed an order on May 29, 2015, denying Lynda's motion, which Lynda does not challenge on appeal. This appeal followed.

## II.    Exclusion of Evidence

In her sole issue on appeal, Lynda argues that the trial court abused its discretion by refusing to admit certain billing records from Sarah's stay at Regent Care into evidence at trial. Specifically, Lynda contends that the trial court should have admitted the billing records because: (1) the billing records were relevant to show that Regent Care did not provide wound care to Sarah between April 30, 2012 and May 11, 2012, (2) she established the proper predicate for the admission of the billing records through the testimony of two separate witnesses, (3) the billing records were self-authenticating, and (4) the probative value of the records was not substantially outweighed by the danger that the billing records would

15

confuse the issues. Further, Lynda argues that the exclusion of the billing records constituted reversible error because the report was crucial to a key issue in the case and was not cumulative of other evidence presented at trial.

We review a trial court's decision to exclude evidence for an abuse of discretion. *JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 161 (Tex. 2015). A trial court abuses its discretion only if it acts in an arbitrary or unreasonable manner or without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc*., 701 S.W.2d 238, 241–42 (Tex. 1985). When reviewing matters committed to the trial court's discretion, a reviewing court may not substitute its own judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). A reviewing court must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling, even if that ground was not raised in the trial court. *Owens–Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 43 (Tex. 1998); *Barnhart v. Morales*, 459 S.W.3d 733, 742 (Tex. App.—Houston [14th Dist.] 2015, no pet.). "Therefore, we examine all bases for the trial court's decision that are suggested by the record or urged by the parties." *Barnhart*, 459 S.W.3d at 742.

The billing records about which Lynda complains consist of what appears to be a five-page billing report. At the top of each page, the billing report states

16

"REGENT CARE CENTER OF THE WOODLANDS (51)[.]" Below this, the billing report lists the following information: "FARRELL, SARAH T. (2009231)[,]" "Type: MRA[,]" "Admit: 6/15/12[,]" and "Discharge: 6/18/12[.]"In addition, each page of the billing report contains three columns of data. These columns are entitled: "Dates of Service[,]" "Days Qty/Typ[,]" and "Cd Description[.]" The billing report appears to span the time period from November of 2009 to July of 2012. For April and May of 2012, the billing report contains the following entries:

| Dates of Service | | Days | Cd Description |
|---|---|---|---|
| From | Thru | Qty/Typ | |
| **April, 2012** | | | |
| 4/01/12 | 4/24/12 | 24 NF | 24 Sub Acute Semi-Pvt |
| 4/28/12 | 4/30/12 | 3 CO | 24 Sub Acute Semi-Pvt |
| 4/29/12 | 4/29/12 | 1 | 222 Wound Care Supplies |
| **May, 2012** | | | |
| 5/01/12 | 5/11/12 | 11 CO | 24 Sub Acute Semi-Pvt |
| 5/12/12 | 5/27/12 | 16 CO | 24 Sub Acute Semi-Pvt |
| 5/28/12 | 5/31/12 | 4 CO | 24 Sub Acute Semi-Pvt |
| 5/10/12 | | 1 | 270 Laboratory |
| 5/16/12 | 5/16/12 | 1 | 221 Medical Supplies Routine |
| 5/15/12 | 5/16/12 | 1 | 222 Wound Care Supplies |
| 5/18/12 | 5/18/12 | 1 | 222 Wound Care Supplies |
| 5/20/12 | 5/20/12 | 1 | 222 Wound Care Supplies |
| 5/22/12 | 5/22/12 | 1 | 222 Wound Care Supplies |
| 5/24/12 | 5/24/12 | 1 | 222 Wound Care Supplies |
| 5/25/12 | | 1 | 210 Pharmacy |

17

| | | | |
|---|---|---|---|
| 5/26/12 | 5/26/12 | 1 | 222 Wound Care Supplies |
| 5/28/12 | 5/28/12 | 1 | 222 Wound Care Supplies |
| 5/30/12 | 5/30/12 | 1 | 221 Medical Supplies Routine |

Certain "payment information" appears to have been redacted from the billing report, although it is unclear specifically what payment information was redacted or if any other redactions were made.

At trial, plaintiff's counsel attempted to introduce the billing report into evidence through two different witnesses. The first witness was the treatment nurse, Nurse Suber. The record reflects that just before offering the report, plaintiff's counsel questioned Nurse Suber regarding her practices for documenting the wound care supplies that she used to treat patients at Regent Care:

Q. All right. . . . [Is] there something that you have to do as a nurse to obtain the supplies that you need for wound care?

A. Yes.

Q. And do you request those supplies?

A. I go to the supply room; and if they are not there then I request them from the supply person.

Q. And if they are in the supply room you make a note that you have taken supplies?

A. No.

Q. No? When you need wound supplies?

A.	When I need wound supplies[,] I go in and get them. There is nowhere where I chart what I'm taking out of there, no.

Q.	Do you know if there is a place inside the facility where it's recorded when wound supplies are needed?

A.	When central supply orders[,] he has a record of what he is ordering, I'm sure.

Q.	Is the equipment that you use or the supplies that you use, is that scanned to the patient's room? Meaning somehow linked to the patient's room, the supplies they need?

A.	No. When I get supplies to do my wound care, I just restock my cart with it and I don't -- I have -- there is a billing record for certain things that I fill out for billing. But I don't scan -- we don't have a scan thing where we scan it to the room.

Q.	When you fill out that form for billing, the personnel is to note that you have had to use certain supplies, correct?

A.	Yes.

Following this testimony, plaintiff's counsel offered the billing report into evidence. Counsel for Regent Care immediately asked to approach the bench and objected to the report on the grounds that it was irrelevant and that plaintiff's counsel had failed to lay the proper predicate for the billing report's admission. The following discussion then took place:

THE COURT: I'm having difficulty seeing the relevance.

[PLAINTIFF'S COUNSEL]: Can I show you?

THE COURT:  Can you tell me?

19

[PLAINTIFF'S COUNSEL]: That's what I'm saying. If you look on page -- under April you will see on April 29th they ordered room supplies which is consistent with the medical record. If you continue to follow that, every other date that they changed the wound dressing, they [specifically] note they need a wound dressing. It follows the medical record perfectly.

THE COURT:  Why do we need it?

[PLAINTIFF'S COUNSEL]: Because they are saying that wound care was provided irrespective of what the record says. This confirms that the records show when wound care was provided.

Following this discussion, counsel for Regent re-urged his objections to the report on the grounds of relevancy and improper predicate. In response, plaintiff's counsel explained generally that, "[a]s for relevancy, it makes it more likely than not" and informed the trial court that he could lay the predicate for the billing report's admission. Plaintiff's counsel then questioned Nurse Suber as follows:

Q.    ([PLAINTIFF'S COUNSEL]): On the top of [the billing report], ma'am, do you see that it says Regent Care Center–The Woodlands?

A.    Yes.

Q.    And that's the facility where Ms. Farrell was a resident, correct?

A.    Correct.

Q.    And the date for the treatment includes April and May 2012; is that correct?

20

. . . . .

A. Yes.

. . . . .

Q. And that's the time that Ms. Farrell was at the facility that is relevant to what we are discussing on wound care, correct?

A. Yes.

Q. All right. And Ms. Farrell's name appears as the person for whom this document applies, correct?

A. Yes.

Following this testimony, plaintiff's counsel again offered the billing report into evidence. Counsel for Regent Care renewed its objection that plaintiff's counsel had failed to lay the proper predicate for the billing report's admission and requested to take the witness on voir dire. On voir dire, Nurse Suber testified as follows:

Q. Ms. Suber, did you know -- have you ever seen [the billing report] before?

A. No, I have not.

Q. Do you have any idea what it is?

A. No.

Q. Do you know -- are you a finance clerk?

A. No.

21

Q. Do you have -- are you responsible at all for any billing?

A. I do submit some things for, like, to the supply person for the billing.

Q. But you don't handle billing?

A. No, I don't handle billing.

Q. You don't have any idea how the billing is taken from whatever you give the clerk to get on [the billing report,] if it gets on there?

A. No.

Thereafter, counsel for Regent Care again objected to the admission of the billing report based on plaintiff's counsel's failure to lay the proper predicate. The trial judge stated that she was "going to sustain the objection as to [the billing report]" and that it was "not admitted."

The next day, plaintiff's counsel attempted to introduce the billing report into evidence through plaintiff's expert witness, Dr. Garcia. Prior to offering the billing report into evidence, plaintiff's counsel questioned Dr. Garcia as follows:

Q. Have you had an opportunity to review whether or not there were orders provided for the nursing home for the care and treatment of the stage 2 wound?

A. Yes, sir.

Q. And what were those orders?

22

A. So originally[,] there was an order for a Duoderm to the site.

Q. What was the nursing staff supposed to do for that Duoderm?

A. Duoderm is a dressing that covers the wound. Basically[,] it was supposed to be changed every other day.

Q. Have you had an opportunity to review documents in the records to determine whether or not you believe that was done?

A. I don't believe that it was.

Q. Why not?

A. Because there was no documentation that it was done.

Following this testimony, counsel for Regent Care asked to approach the bench, and the following discussion occurred:

[DEFENSE COUNSEL]: Your Honor, this goes back to the [billing report] that has previously been discussed. If we are going to go into this line of questioning, I'm going to have to request outside of the presence of the jury to take her on voir dire to determine if she's an auditor and to determine if she has -- what her experience is.

[PLAINTIFF'S COUNSEL]: I would like to just lay the predicate; I will not get into the contents. If he needs to object I need to make an offer. I have to be able to protect the record.

[DEFENSE COUNSEL]: Your Honor, he can make an offer.

[PLAINTIFF'S COUNSEL]: First of all, as I understand it, Your Honor has said that the document was not relevant. By getting the witness to testify why it's relevant, I need to make that offer.

23

THE COURT: Let's ask her a question before you give her an exhibit that's not in evidence. Ask her a question. You haven't asked her that question yet.

After this discussion, plaintiff's counsel questioned Dr. Garcia as follows:

Q. Dr. Garcia, have you reviewed records in the past?

A. Yes.

Q. Are there documents that you can look at to help you determine whether or not care has been provided?

A. Yes.

Q. And would one of those documents be a billing record?

A. Yes.

Q. And do you believe that as an expert[,] those documents assist you in determining whether or not care has been provided?

A. Yes, sir.

Q. Why is that?

A. Because a facility is going to charge for dressings that are used to care for the patient. If there are no charges on that patient's record, then there is no indication that a dressing has been ordered to be charged for the patient.

Q. And as an expert reviewing cases, is it important to you to know whether or not those charges were entered?

A. Yes.

24

Q. And are you able to tell by looking at a document that contains those charges whether or not charges were made on a particular day?

A. Yes.

At this point in the testimony, counsel for Regent Care again asked to approach the bench and objected to the admission of the billing report as follows: "Your Honor, she's not qualified; this deals with auditing. This deals with forensic auditing. She's not qualified in that capacity. At this point[,] I would be asking to take her on voir dire outside of the presence of the jury." Plaintiff's counsel asked the trial judge to "look at one thing[,]" to which the trial judge responded, "I don't believe the exhibit is coming in. I have not admitted the exhibit." When plaintiff's counsel asked why the trial court was refusing to admit the billing report, the trial judge stated, "[s]ame as yesterday." Plaintiff's counsel then asked for clarification regarding the basis of the trial court's ruling, and the trial judge stated:

THE COURT: Yesterday -- as I understand it[,] I haven't had an offer yet of [the billing report].

[PLAINTIFF'S COUNSEL]: I'm sorry.

THE COURT: I haven't had an offer of [the billing report].

[PLAINTIFF'S COUNSEL]: Okay. I was trying to do that when you asked me not to.

THE COURT: And she's not a witness that can establish the record. We have gone over the business record portion of that. But

25

you need to move on. I'm not admitting [the billing report]. If you are offering it, I'm denying the admission.

After this exchange, plaintiff's counsel tendered a copy of a business records affidavit for the billing report to the trial court and again stated that he was offering the billing report into evidence. The following discussion then occurred:

[DEFENSE COUNSEL]: On the document itself we would be reurging the same thing. It is unduly prejudicial because it's confusing. We would have to go ahead and then bring in other witnesses. We would have to go ahead and bring in more witnesses to explain billing cycles, to explain a whole bunch of items.

And this witness has absolutely no idea about what those are. I'm confident that on voir dire this witness will not be qualified to be able to testify about forensic accounting, forensic analysis or any form of audit.

THE COURT: All right. We're not going there. Right now that's not coming in.

[PLAINTIFF'S COUNSEL]: So Your Honor is not allowing to admit [the billing report]?

THE COURT: I don't understand that there has been an offer with this witness yet. But --

[PLAINTIFF'S COUNSEL]: I will make that offer.

Thereafter, plaintiff's counsel questioned Dr. Garcia as follows:

Q. Dr. Garcia, would it assist you in communicating to the jury to be able to use billing documents that would show dates that treatment was awarded?

A. Yes.

26

Q.   And why is that?

A.   Again because if a bill was not generated to show that a dressing was used on the patient, then it's not likely that a dressing was being ordered for that patient.

Q.   All right.

At the conclusion of this testimony, counsel for Regent Care requested to take Dr. Garcia on voir dire. On voir dire, Dr. Garcia testified that she is not a certified public accountant or a forensic auditor; that she has never performed an audit, been in charge of billing, or audited any bills; that she has no accounting experience; and that she has no knowledge of the billing cycles at any nursing home in the Montgomery County area. Thereafter, counsel for Regent Care renewed his objection to the billing report on the basis that Dr. Garcia was "unqualified as an expert to talk about anything regarding finances or regarding any type of billing cycles[.]"The trial court sustained the objection and stated: "Proper predicate is not laid with this witness. I believe the witness has covered the ground without the exhibit."

To be admissible, evidence must be relevant to the issues presented in the case. *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 186 (Tex. 2001);

27

Tex. R. Evid. 402.[4] Evidence is relevant if: (1) it has any tendency to make a fact more or less probable than it would be without the evidence, and (2) the fact is of consequence in determining the action. Tex. R. Evid. 401. In determining relevancy, we look at the purpose of offering the evidence. *Rhey v. Redic*, 408 S.W.3d 440, 460 (Tex. App.—El Paso 2013, no pet.). The relevancy test is satisfied if there is some logical connection, either directly or by inference, between the fact offered and the fact to be proved. *Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 793 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

"When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist." Tex. R. Evid. 104(b). Rule 104(b) recognizes that "the relevance of evidence may be dependent on proof of predicate facts that provide the logical connection between the proffered evidence and the proposition for which the evidence is offered." *Int'l Transquip Indus., Inc. v. Browning/Ferris Indus., Inc.*, 54 S.W.3d 37, 40 (Tex. App.—Texarkana 2001, no pet.). If there is no evidence sufficient to support a

---

[4]The Texas Rules of Evidence were amended effective April 1, 2015. *See* Tex. Sup. Ct. Order, Misc. Docket No. 15-9048 (Mar. 10, 2015) (published at 78 Tex. B.J. 374 (2015)). The amendments to most of the rules, including the rules of evidence cited in this opinion, were "stylistic only." *Id*. Therefore, we cite to the amended version of the rules for purposes of this opinion.

finding of the predicate fact upon which the relevance of the proffered evidence depends, the trial court does not abuse its discretion in excluding the evidence. *See* Tex. R. Evid. 104(b); *Int'l Transquip*, 54 S.W.3d at 40–41; *In re Commitment of Hernandez*, No. 09-12-00329-CV, 2013 WL 5302615, *4–5 (Tex. App.—Beaumont Sept. 19, 2013, no pet.) (mem. op.).

Lynda contends that the billing report is relevant because the report reflects no charges for wound care supplies between April 30, 2012 and May 11, 2012, and thus, the report makes it more probable that Regent Care did not provide wound care to Sarah during that time period. However, the absence of charges in the billing report only tends to make it more probable that Regent Care did not provide wound care to Sarah during the period between April 30, 2012 and May 11, 2012 if the report reflects all dates that Regent Care used wound care supplies to treat Sarah. The relevance of the report therefore depends on whether: (1) the dates listed in the billing report for the charges for "wound care supplies" reflect the actual dates on which Regent Care used wound care supplies to treat Sarah; and (2) the billing report contains a charge for "wound care supplies" for every date that Regent Care used wound care supplies to treat Sarah. *See* Tex. R. Evid. 104(b), 401.

29

Although, as Lynda points out, the billing report contains Sarah's name at the top of each page and contains charges for "wound care supplies" for certain "[d]ates of service" in April and May of 2012, the report, on its face, does not indicate what type of report it is, what limits or parameters were used to create the report, or—most significantly—whether the charges for "wound care supplies" in the report are intended to reflect all dates that Regent Care used wound care supplies to treat Sarah during her stay. As such, the billing report, by itself, does not establish a logical connection between the report's contents and Lynda's contention that Regent Care provided no wound care to Sarah between April 30, 2012 and May 11, 2012. We therefore examine whether Lynda laid the proper predicate through the testimony of Nurse Suber or Dr. Garcia to show the relevance of the billing report at trial.

At trial, Nurse Suber, reading from the report, testified that the report appeared to apply to Sarah, that it contained Regent Care's name, and that it listed entries for dates in March and April of 2012, which is the time period that Sarah was a resident at Regent Care. However, on voir dire, Nurse Suber testified that she had never seen the billing report, that she did not know what it was, that she is not a finance clerk and does not handle billing, and that she had no knowledge regarding how—if at all—the information that she included in the billing forms

that she filled out for certain types of supplies appeared on this type of billing report. Further, Nurse Suber testified that when she needed wound care supplies at Regent Care, she would take the supplies from the supply room without recording what items she took, and that the wound care supplies that she used were not scanned to particular patients' rooms. In addition, although Nurse Suber testified that she would fill out a billing form for certain types of supplies, she did not explain what types of supplies those were. In short, Nurse Suber's testimony does not show that she had any knowledge regarding the billing report or that the entries in the billing report reflect all dates that Regent Care used wound care supplies to treat Sarah. Lynda therefore failed to lay the proper predicate to show the relevance of the billing report through Nurse Suber's testimony. *See* Tex. R. Evid. 104(b), 401, 402; *Int'l Transquip*, 54 S.W.3d at 40–41. Accordingly, we conclude that the trial court did not abuse its discretion when it refused to admit the billing report into evidence through Nurse Suber.

Lynda next attempted to introduce the billing report into evidence through Dr. Garcia. Dr. Garcia testified generally that billing records can assist her in determining whether a facility has provided care to a patient "[b]ecause a facility is going to charge for dressings that are used to care for the patient." She testified that "[i]f there are no charges on that patient's record, then there is no indication that a

dressing has been ordered to be charged for the patient." She also responded affirmatively when asked whether she is "able to tell by looking at a document that contains those charges whether or not charges were made on a particular day." When asked whether it would assist her in her testimony to the jury to be able to use "billing documents that would show dates that treatment was awarded[,]" Dr. Garcia responded that it would, explaining generally that "if a bill was not generated to show that a dressing was used on a patient, then it's not likely that a dressing was being ordered for that patient." Dr. Garcia, however, did not testify that she has any knowledge specifically pertaining to Regent Care's billing practices or its billing reports. Moreover, with respect to the billing report, she provided no testimony regarding what type of billing report it was, how the report was created, whether certain types of charges are excluded from the report, or whether this type of report is intended to reflect a charge for "wound care supplies" for every date that Regent Care uses wound care supplies to treat a patient. Therefore, her testimony is not sufficient to support a finding that the entries for "wound care supplies" in the billing report reflect all dates that Regent Care used wound care supplies to treat Sarah. Accordingly, we conclude that the trial court did not abuse its discretion in ruling that Lynda did not lay the proper predicate

through Dr. Garcia's testimony to show the relevance of the billing report. *See* Tex. R. Evid. 104(b), 401, 402; *Int'l Transquip*, 54 S.W.3d at 40–41.

In her brief, Lynda asserts that she was unable to lay the proper predicate through Dr. Garcia to establish the relevance of the billing report because the trial court refused to allow Dr. Garcia to testify from the report. The record reflects that after the trial court sustained Regent Care's objections to the billing report, the following exchange took place between the trial court and the attorneys:

> [PLAINTIFF'S COUNSEL]: Your Honor, I would also point out that you are not allowing me to show the document to the witness; is that correct?
>
> THE COURT: You can show the document to the witness. But she's not going to be able to testify from an exhibit that's not admitted into evidence.
>
> [PLAINTIFF'S COUNSEL]: I understand, Your Honor. But I need to be able to lay the predicate Your Honor has asked me to -- said that I can't lay it. I would like her to be able to look at the document to lay that predicate.
>
> THE COURT: No. We need to move on. I have ruled on the exhibit. I have made the ruling; let's move on.
>
> [DEFENSE COUNSEL]: Your Honor, we would urge that [plaintiff's counsel] can make an offer of proof at some later point in time during trial.
>
> THE COURT: I agree. Thank you.

Accordingly, the record reflects that although the trial court refused to allow Dr. Garcia to testify from the billing report, the trial court stated that Lynda's attorney could make an offer of proof to show what testimony he would have elicited from Dr. Garcia if she had been permitted to testify regarding the billing report. Lynda, however, has not cited to any offer of proof or bill of exception containing such testimony in the record, and our review of the record has revealed none. The record does not indicate that Lynda made the trial court aware of what the substance of Dr. Garcia's testimony would have been had she been permitted to testify from the billing report. Therefore, Lynda has failed to preserve any complaint for our review regarding the trial court's refusal to allow Dr. Garcia to testify from the billing report so as to lay the proper predicate for the report's admission. *See* Tex. R. Evid. 103(a)(2) (providing that if a court's ruling excludes evidence, then to preserve error, the party must inform the court of its substance by an offer of proof, unless the substance was apparent form the context); Tex. R. App. P. 33.2 (providing procedure for filing formal bill of exception); *Bobbora v. Unitrin Ins. Servs.*, 255 S.W.3d 331, 335 (Tex. App.—Dallas 2008, no pet.) (noting that the "[f]ailure to demonstrate the substance of the excluded evidence results in waiver").

Finally, Lynda contends that she established the proper predicate for the admission of the billing report because the report was self-authenticating under Rule 193.7 of the Texas Rules of Civil Procedure. However, Rule 193.7 concerns the authentication of evidence, not its relevance. *See* Tex. R. Civ. P. 193.7. The mere fact that a document is self-authenticating under Rule 193.7 does not also mean that the document is relevant and does not dispose of the need to present evidence of any predicate fact upon which the relevance of the document depends.

We conclude that the trial court did not abuse its discretion by excluding the billing report on the basis that Lynda did not lay the proper predicate to show the relevance of the report. *See* Tex. R. Evid. 104(b), 401, 402; *Int'l Transquip*, 54 S.W.3d at 40–41; *In re Hernandez*, 2013 WL 5302615 at *4–5. We therefore overrule Lynda's sole issue and affirm the judgment of the trial court.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on December 28, 2015
Opinion Delivered December 29, 2016

Before McKeithen, C.J., Kreger and Johnson, JJ.

35